**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| HOLMES COUNTY BANK AND TRUST COMPANY,<br><br>*Plaintiff,*<br><br>v.<br><br>FAIR ISAAC CORPORATION,<br><br>*Defendant.* | Civil Action No.<br><br>**Class Action Complaint**<br><br>**Jury Trial Demanded** |

Plaintiff Holmes County Bank and Trust Company ("Plaintiff"), on behalf of itself and all others similarly situated, files this complaint against Fair Isaac Corporation ("Fair Isaac" or "Defendant") for violations of federal antitrust laws and state antitrust and consumer protection laws. The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel.

## I.  NATURE OF THE CASE

1.  A credit score is a three-digit, statistical number designed to represent a borrower's credit risk or the likelihood that that borrower will pay back a loan on time. Fair Isaac creates and distributes a certain brand of credit scores, known as FICO® Scores. FICO Scores have dominated the credit score market for nearly three decades.

2.  Fair Isaac has been vocal about its dominant position in the market, bragging that their FICO Scores are "the 800-pound gorilla."[1] In fact, Fair Isaac advertises that its FICO Scores are used for 90% of all lending decisions in the United States and that it sells four times more FICO Scores per year than McDonald's sells hamburgers worldwide.[2]

3.  In the United States, there are two distinct markets for credit scores: (1) the market for supplying credit scores to lenders, financial institutions, and other businesses for risk management decisions (the "business-to-business" or "B2B" market) and (2) the market for supplying credit scores directly to consumers to monitor their own credit records (the "business-to-consumer" or "B2C" market). Plaintiff brings this action on behalf of itself and others who purchased FICO credit scores in the B2B market.

---

[1] "What Does 'Good' Credit Really Mean?," CNBC, *available at* https://www.cnbc.com/id/27458815.

[2] https://www.fico.com/25years/.

4.      Fair Isaac mainly distributes FICO Scores through the three national credit reporting agencies—also known as credit bureaus or consumer reporting agencies—Equifax Inc. ("Equifax"), Experian PLC ("Experian"), and Trans Union LLC ("TransUnion").

5.      The credit reporting agencies sell lenders, financial institutions, and other businesses credit reports and credit scores, including Fair Isaac's FICO Scores, that are used to make decisions about whether and on what terms to extend credit to American consumers.

6.      For decades, the credit reporting agencies depended on Fair Isaac for the credit scores they distributed, and Fair Isaac used the credit reporting agencies and the restrictions in the distribution agreements it entered into with them to implement its multi-pronged anticompetitive scheme.

7.      Fair Isaac's distribution agreements with the credit reporting agencies contain multiple provisions that are designed to maintain Fair Isaac's dominant position in the marketplace and to extract monopoly rents. For one, Fair Isaac restricts the credit reporting agencies' ability to develop or distribute competing credit scores. Fair Isaac also uses its royalty prices for FICO Scores to inhibit the credit reporting agencies from bundling a competing score with the FICO Score when selling to downstream customers. In addition, because Fair Isaac has insisted that all three credit reporting agencies pay it the same royalty price for FICO Scores, the individual agencies cannot negotiate for a lower royalty and pass along that benefit to their customers. The credit reporting agencies have nonetheless agreed to these (and other) restrictions in their dealings with Fair Isaac and thus joined Fair Isaac's anticompetitive scheme.

8.      One good example of how Fair Isaac was able to use its dominant position and distribution agreements to stifle competition involves a company called VantageScore Solutions, LLC ("VantageScore"). In 2006, VantageScore, an independent joint venture of the three

national credit reporting companies, launched a competing credit score known as VantageScore®. From the outset, VantageScore was competitively priced, highly predictive, and scored millions more Americans than Fair Isaac's FICO products. Indeed, today, by making full use of the credit reporting agencies' consumer data, including rental and utility payments, VantageScore is capable of providing credit scores to 30 million more Americans than Fair Isaac. If VantageScore were widely adopted by lenders, these creditworthy Americans would have the opportunity to apply for a home mortgage, car loan, or credit card and obtain credit at lower cost.

9.     Rather than compete on the merits with VantageScore, though, Fair Isaac engaged in a pattern of anticompetitive conduct to discourage the adoption of VantageScore and preserve its own monopoly. Fair Isaac has abused its monopoly power to impose onerous contractual terms on the credit reporting agencies designed to prevent them from successfully marketing and selling VantageScore as an alternative to FICO Scores and has waged a disparaging public relations and advertising campaign to create fear, uncertainty, and doubt about VantageScore's viability and reliability with lenders and consumers.

10.     Fair Isaac's conduct has not gone unnoticed by the federal government. On March 13, 2020, Politico reported that the U.S. Department of Justice ("DOJ") opened an antitrust investigation into Fair Isaac. According to Politico, "The probe follows years of complaints from rivals about Fair Isaac's dominance, and comes amid efforts by Congress and financial regulators to inject more competition into the credit score market."[3] Additionally, the site reported that

---

[3] "DOJ opens antitrust probe into credit score giant Fair Isaac," Politico, *available at* https://www.politico.com/news/2020/03/13/justice-fair-isaac-antitrust-129204.

"[DOJ] recently sent letters to Fair Isaac and others in the consumer credit industry asking them to preserve documents."[4]

11.      On March 15, 2020, Fair Isaac confirmed that it was under investigation by the DOJ's Antitrust Division, for exclusionary conduct.[5]

12.      DOJ's investigation follows an ongoing private action between TransUnion and Fair Isaac in which TransUnion has brought antitrust counterclaims against Fair Isaac regarding Fair Isaac's anticompetitive conduct in the market for credit scores.[6] On March 27, 2019, the district court denied Fair Isaac's motion to dismiss TransUnion's antitrust counterclaims.[7]

13.      As a result of Fair Isaac's anticompetitive conduct, Plaintiff and members of the Class have been injured in their business and property during the Class Period (defined below), and their injury is continuing. Plaintiff seeks injunctive relief, treble damages, and/or related relief under federal antitrust laws and state antitrust and consumer protection laws.

## II.      JURISDICTION AND VENUE

14.      This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) and pursuant to 28 U.S.C. §§ 1331 and 1337(a). This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

15.      Venue is appropriate within this district under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (venue for antitrust matters brought under the federal antitrust laws) or 28 U.S.C. §1391(b) (federal venue statute). Defendant transacted business, was found, or had agents within

---

[4] *Id.*

[5] https://www.fico.com/en/newsroom/fico-statement-regarding-antitrust-investigation.

[6] *Fair Isaac Corporation v. Trans Union, LLC*, No. 17-cv-08318 (N.D. Ill.), ECF No. 38.

[7] *Id.*, ECF No. 96.

this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

16.     The Court has personal jurisdiction over Defendant. Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme throughout the United States, including in this District. The scheme has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Defendant's conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

## III.     THE PARTIES

### A.     Plaintiff

17.     Plaintiff Holmes County Bank and Trust Company is a bank with its principal place of business at 316 Court Square, Lexington, Mississippi, 39095.

18.     With four locations throughout Mississippi, Plaintiff has provided financial services to its customers since 1932.

19.      During the Class Period, Plaintiff directly purchased B2B credit scores from Fair Isaac, credit bureaus, or both. Plaintiff's purchases from credit bureaus include purchases through Equifax and TransUnion.

### B.     Defendant

20.     Defendant Fair Isaac is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California, 95110.

## IV.     TRADE AND COMMERCE AFFECTED

21.     Fair Isaac is in the business of selling credit scores in the B2B market.

22.     At all times pertinent to this Complaint, Fair Isaac has sold a substantial amount of credit scores in the B2B market in interstate commerce in numerous states around the United States.

23.     Fair Isaac's conduct has affected a substantial amount of interstate trade and commerce in the United States.

## V.     CREDIT SCORES IN THE UNITED STATES

### A.     Credit Scores

24.     Credit scores are the most widely-used indicators of borrowers' creditworthiness in the United States. Lenders, financial institutions, and other businesses rely on credit scores to decide whether and on what terms to extend credit. A credit score can determine whether an individual will be able to get a mortgage, credit card, auto loan, or other credit product and the rate that the individual will pay.

25.     Credit scores are typically three-digit numbers that are designed to assess credit risk. Higher scores generally indicate that a consumer poses less credit risk. Credit scores are produced using credit scoring systems that apply a credit scoring algorithm to a borrower's credit report. Credit scores are usually accompanied by "reason codes" which inform the lender about the reasons that contributed most significantly to reducing a particular borrower's credit score.

26.     Credit reporting agencies collect and supply aggregated credit data in the form of reports as permitted under the Fair Credit Reporting Act, 15 U.S.C. § 1681. The credit reporting agencies expend substantial resources to maintain sophisticated databases of credit data and compete with one another to provide the most comprehensive, timely, and accurate information on borrowers' financial behavior. The credit reporting agencies continuously gather credit and financial data about potential borrowers from creditors, government entities, public records, collection agencies, and other third parties and compile this information into a "credit file." The

credit reporting agencies sell credit reports, which include information gathered from borrowers' credit files, to businesses (B2B) and consumers (B2C).

27.     While credit *scores*, such as a FICO Score, are frequently sold together with credit *reports*, credit reports are different from credit scores and can be sold independently. A credit report is a statement that has detailed information about a borrower's credit activity and current credit situation. A credit report might, for example, include information about that borrower's history of mortgage payments, credit card balances, credit card payments, and credit inquiries. A credit score takes the detailed information in a credit report and turns it into a single three-digit number.

## B.     The Market for Credit Scores in the United States

28.     In the United States, the B2B and B2C markets are two distinct markets for credit scores.

29.     The customers in the B2B market, which include lenders and financial institutions, are a distinct and recognizable group of purchasers of credit scores that use credit scores differently than consumers in the B2C market. Lenders, financial institutions, and other businesses generally buy the credit scores one score at a time—i.e., "transactionally"—or in batches that include the scores of multiple individuals, and they then use those scores for reasons such as identifying qualified borrowers to whom a preapproved credit offer will be extended ("pre-screening"), making lending decisions, or reviewing the risk associated with existing borrowers for purposes such as extending additional credit or changing other account terms ("account management"). By contrast, in the B2C market, consumers typically purchase one score at a time—their own—to manage their credit, protect their identity, or assess their likelihood of obtaining credit. In other words, customers in the B2B market purchase scores to use them to sell or manage another credit risk product whereas consumers in the B2C market

purchase the scores as an end-product. Because of the significant differences between the ways credit scores are used in the B2B and B2C markets, credit scores can be priced differently in these two markets.

30.     While the B2B market is a mature market that has existed for decades, the B2C market is relatively new but is growing as more consumers become interested in credit monitoring and identity protection. Today, American consumers have signed up for over 160 million credit monitoring or identity protection accounts from businesses such as Capital One, Credit Karma, and LifeLock, and many of those accounts include access to the consumer's credit score.

31.     It is well-recognized that the B2B market is distinct from the B2C market credit. Indeed, the risk scoring industry, industry analysts, policy analysts, investors, and even Fair Isaac all acknowledge that the B2B market and B2C market are distinct. For example, in its 2019 10-K, Fair Isaac distinguished between its "business-to-business scoring solutions and services" and "business-to-consumer scoring solutions and services including myFICO® solutions for consumers, and associated professional services."[8]

32.     The B2B credit score market is characterized by significant barriers to entry. Customers, particularly lenders and financial institutions, are strongly inclined and incentivized to stick with the type of credit score that they have been using because there are significant "switching costs" associated with adopting a new credit score—regardless of whether it is an updated version of the score already used or an entirely new brand of credit score. These switching costs arise because employees have to be trained in the properties and characteristics of a new score; lenders must ensure that the new score will be adequately predictive of the

---

[8] Fair Isaac Corp., Annual Report (Form 10-K) (2019).

creditworthiness of their own customer base; lenders must conduct extensive, costly, and time-consuming validation tests to determine whether the new score is cost-effective; and lenders may need to invest in updating their internal systems to ensure technical compatibility between those systems and a new score. These switching costs are so substantial that firms often decide not to switch even if a new score is cheaper or more predictive than the old score. In March 2006, then-CEO of Fair Isaac Thomas Grudnowski told American Banker that switching to a new credit score "is really, really hard, and you have to have a really, really good reason to do it."[9]

33.    Network effects also characterize the credit scoring market. As more banks and consumers use a particular type of credit score, that credit score becomes a de facto "industry standard." For example, in the mortgage and auto loan industries the consistent use of particular credit scores facilitates the bundling of large groups of mortgage and auto loans from different originators into securities that can be sold to investors. Because of the consistent use of a single type of credit score, marketing materials for these securities can include data on the average and stratified credit scores of the borrowers associated with the underlying loans.

### C.    Distribution of FICO Scores in the B2B Market

34.    Fair Isaac mainly distributes FICO Scores through the three credit reporting agencies. During fiscal years 2019, 2018, and 2017, Fair Isaac's revenues generated from its "agreements with Experian, TransUnion and Equifax collectively accounted for 29%, 25% and 20% of [its] *total revenues*, respectively."[10]

---

[9] "Bureaus Take Another Run At Fair Isaac" American Banker, *available at https://www.americanbanker.com/news/bureaus-take-another-run-at-fair-isaac-br-i-will-single-algorithm-pitch-be-enough-to-persuade-lenders-i.*

[10] Fair Isaac Corp., Annual Report (Form 10-K) (2019).

35.     To receive FICO scores, Plaintiff has entered into a service agreement with Equifax. The agreement makes clear that Plaintiff receives FICO scores jointly from Equifax and Fair Isaac.

36.     For example, the section of Plaintiff's service agreement titled "Additional Terms and Conditions Applicable to Fair, Isaac Scores" states that the "following additional terms and conditions apply to any Scores ***jointly provided by Equifax and Fair, Isaac & Co.***" (Fair Isaac was formerly known as Fair, Isaac and Company.)

37.     Plaintiff's service agreement also states that "Equifax is the authorized agent of Fair, Isaac for purposes of executing this Agreement as it pertains to the Scores and for collection of all fees and charges arising thereunder with respect to the Scores."

**D.      Fair Isaac Has a Monopoly in the Market for Credit Scores**

38.     Fair Isaac has had a monopoly over the market for B2B credit scores in the United States for roughly three decades, largely through the dominance of its FICO product line, which includes many different types of FICO Scores.

39.     Introduced in the 1980s, Fair Isaac's FICO Classic credit scores are the best known and most widely used in the United States. FICO Classic is a tri-bureau-enabled scoring system, which means that it can be used with all three credit reporting agencies' data and allows lenders, financial institutions, and other business to shift their business across all three credit reporting agencies by lowering switching costs. Being able to shift business between the credit reporting agencies allows lenders to negotiate better pricing and to deal with the particular credit reporting agencies that have suitable data regarding the characteristics of individual borrowers or market segments. FICO Classic applies an algorithm to each credit reporting agency's data and generates a score between 300 and 850 that purports to give an indication of a borrower's credit

risk. It also generates a set of "reason codes" that explain the reasons the borrower has not been assigned the maximum score.

40.    Because each credit bureau has different data, a borrower's FICO Score may be different for the three credit bureaus. Fair Isaac explains that the differences could be attributed to one credit bureau "hav[ing] unique information captured on a [borrower] that is not being captured by the other two, or the same data element may be stored or displayed differently by the credit bureaus."[11]

41.    Over the years, Fair Isaac has come out with new versions of its Classic FICO Score. The FICO Score 8 is currently the most widely used version; however, FICO Score 9 is the newest version. Additionally, there are industry-specific scores that are designed for specific types of credit, such as auto loans or credit cards. According to Fair Isaac, "The foundation of these versions is the same as the base FICO Score versions, but they are fine-tuned based on industry-specific risk behaviors."

---

[11] "Why are my FICO Scores different for the 3 credit bureaus?" myFICO, *available at* https://www.myfico.com/Credit-Education/Questions/why-are-my-credit-scores-different-for-3-credit-bureaus.

42. In the chart below, Fair Isaac illustrates which FICO Scores are in use and in which industries:[12]

| Experian | Equifax | TransUnion |
|---|---|---|
| *Most widely used version* | | |
| FICO® Score 8 | FICO® Score 8 | FICO® Score 8 |
| *Versions used in auto lending* | | |
| FICO® Auto Score 8 | FICO® Auto Score 8 | FICO® Auto Score 8 |
| FICO® Auto Score 2 | FICO® Auto Score 5 | FICO® Auto Score 4 |
| *Versions used in credit card decisioning* | | |
| FICO® Bankcard Score 8 | FICO® Bankcard Score 8 | FICO® Bankcard Score 8 |
| FICO® Score 3 | FICO® Bankcard Score 5 | FICO® Bankcard Score 4 |
| FICO® Bankcard Score 2 | | |
| *Versions used in mortgage lending* | | |
| FICO® Score 2 | FICO® Score 5 | FICO® Score 4 |
| *Newly released version* | | |
| FICO® Score 9 | FICO® Score 9 | FICO® Score 9 |
| FICO® Auto Score 9 | FICO® Auto Score 9 | FICO® Auto Score 9 |
| FICO® Bankcard Score 9 | FICO® Bankcard Score 9 | FICO® Bankcard Score 9 |

43. Fair Isaac brags about its dominance in the credit score markets and, in particular, its stranglehold on the larger and more mature B2B market. On its public website, Fair Isaac advertises that:

- 10 billion FICO Scores are sold each year, which is four times the number of hamburgers that McDonald's sells worldwide each year;

- 27.4 million FICO Scores are sold every day, which is over twice the number of cups of coffee Starbucks sells worldwide in a day; and

- 90% of all lending decisions in the United States rely on FICO Scores.[13]

44. Similarly, in its 2019 10-K, Fair Isaac described its "FICO Scores" as "the standard measure in the U.S. of consumer credit risk" and reported that "FICO Scores are used . .

---

[12] "FICO Scores Versions: Did you know you have more than one FICO Score?" myFICO, *available at* https://www.myfico.com/credit-education/credit-scores/fico-score-versions.

[13] https://www.fico.com/25years/.

. by nearly all of the major banks, credit card organizations, mortgage lenders and auto loan originators."[14]

45.     The use of FICO Scores is particularly entrenched among mortgage lenders because the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") have mandated the use of Classic FICO Scores for 12 years. Fannie Mae and Freddie Mac buy mortgages from lenders and either hold these mortgages in their portfolios or package the loans into mortgage-backed securities ("MBS") that may be sold. Because lenders use the cash raised by selling mortgages to Fannie Mae and Freddie Mac to engage in further lending, these entities' purchases help ensure that borrowers who buy homes and investors that purchase apartment buildings and other multifamily dwellings have a continuous, stable supply of credit available to them. Fannie Mae and Freddie Mac require banks and mortgage lenders to acquire and use Classic FICO Scores when available in order to sell mortgage loans to Fannie Mae and Freddie Mac.

46.     Fair Isaac representatives have described Fair Isaac's FICO Score as "the 800-pound gorilla" in the market for credit scores and bragged about Fair Isaac's market share.[15] For example, in November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President Michael Pung stated that:

- The FICO scoring system "is the most widely used credit scoring system here in the U.S.;"

- "Virtually every major lender in the U.S. [uses] the FICO Score for some sort of credit lending decision;" and

---

[14] Fair Isaac Corp., Annual Report (Form 10-K) (2019).

[15] "What Does 'Good' Credit Really Mean?," CNBC, *available at* https://www.cnbc.com/id/27458815.

- Fair Isaac has "maintained a 90-plus percent market share for at least the [last] 13 years."[16]

47.    Fair Isaac representatives have also recognized that FICO Scores benefit from the network effects created by the widespread use of FICO Scores in many industries. For example, in November 2011, then-CEO of Fair Isaac Mark Greene explained that the "network effect" of "FICO Scores . . . being sort of the standard language" and "having everybody . . . standardize on a FICO Score, that's magic."[17]

48.    Fair Isaac's monopoly in the market for credit scores has given it power to control prices, particularly in the mature B2B market. Fair Isaac's CEO Will Lansing has noted that in the B2B market for credit scores Fair Isaac has "quite a bit of discretion and whether we want our margins to be higher or lower or where they are."[18]

### E.    Attempts to Compete Have Not Affected Fair Isaac's Monopoly in the Market for Credit Scores

49.    Before 2006, credit scores other than Fair Isaac's FICO Scores existed but failed to gain substantial enough market share to challenge Fair Isaac's dominance in the market for credit scores. Each of the credit reporting agencies had its own proprietary, "in-house" credit scores that reflected only the consumer information from one credit reporting agency: TransUnion had "TransRisk," Experian had "ScorexPlus" (designed for lenders) and "Plus" (designed for consumers), and Equifax had "ERS."

50.    Then in March 2006, VantageScore, the most promising competitor to FICO Scores in both the B2B and B2C markets, introduced the VantageScore credit score and credit

---

[16] Fair Isaac Corp., Transcript, JPMorgan Ultimate Services Investor Conference (Nov. 14, 2017).

[17] Fair Isaac Corp., Transcript, Analyst/Investor Day (Nov. 3, 2011).

[18] Fair Isaac Corp., Transcript, Barclays Global Technology, Media and Telecommunications Conference (Dec. 12, 2017).

scoring system. VantageScore offered customers the first tri-bureau-enabled alternative to FICO Scores.

51.     From the time that it was first released, VantageScore has provided credit scores for millions more borrowers than the FICO scoring systems. Whereas Fair Isaac's FICO scoring systems would not generate a score if a consumer had not used credit in more than six months or if a credit account was less than six months old, VantageScore calculated scores for consumers that had not used credit for up to two years. It also reached more consumers by using utility and telecommunications payment histories when reported to the credit rating agencies.

52.     Today, VantageScore provides scores for 30 million more Americans than traditional FICO scoring systems—reducing the number of adults without a credit score by almost half. Fair Isaac's FICO Classic credit scoring system is less advanced than VantageScore and excludes many creditworthy Americans that VantageScore can reliably score. In fact, approximately one-fourth of the U.S. population does not have a FICO Score. Ten million of those newly scored individuals are "prime" borrowers that should be attractive to traditional lenders.

53.     Without a credit score, it is difficult or impossible to apply for or successfully obtain a mortgage, car loan, or reasonable interest rates on personal lines of credit. Not having a credit score can also have drastic effects outside of the credit market. For example, credit scores are increasingly used by landlords.

54.     Those excluded by Fair Isaac's traditional FICO scoring systems—who face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and apartment housing—include disproportionate numbers of low-income and minority consumers. Indeed, one advocacy group focused on making it possible for people with limited

incomes, especially people of color, to achieve financial security, has observed: "Black and Hispanic individuals are . . . significantly more likely than white individuals to be credit invisible"—meaning that they have "no established credit history"—or "unscored"—meaning that they "lack[] sufficient or recent enough credit history to be given a credit score."[19] VantageScore calculates a score for 9.5 million Hispanic and African-American consumers who do not have a FICO Score, including 2.7 million minority consumers who should be considered "prime" borrowers.

55.     Despite the advantages of using VantageScore, Fair Isaac continues to have a monopoly in the market for credit scores. In February 2013, at a Morgan Stanley Conference, Fair Isaac's CEO Will Lansing explained that despite the existence of VantageScore, "there [is] not that much competition around our scores business" because "FICO Scores are very much part of the fabric of the banking industry" and "really deeply imbedded." Mr. Lansing claimed that because "Fannie and Freddie have mandated that FICO Scores have to be part of a mortgage origination," Fair Isaac is "in very low risk territory."[20]

## VI.    FAIR ISAAC'S EXCLUSIONARY ACTS AND OTHER ILLEGAL CONDUCT TO MAINTAIN AND EXPAND ITS MONOPOLY

56.     Fair Isaac has used its monopoly power to coordinate a multi-faceted campaign to eliminate competition. Fair Isaac has been explicit that this is its goal. In April 2015, Mr. Lansing informed investors on a quarterly earnings conference call that Fair Isaac's wanted to ensure that "the entire industry adopts FICO scores instead of [other] scores."[21]

---

[19] "The Importance of Credit Reports & Credit Scores for Building Financial Security," CFED, *available at* https://prosperitynow.org/files/PDFs/Credit_Fact_File_07-2016.pdf.

[20] Fair Isaac Corp., Transcript, Morgan Stanley Technology, Media & Telecom Conference (Feb. 27, 2013).

[21] Fair Isaac Corp., Transcript, Q2 2015 Earnings Call (April 23, 2015).

57.    To achieve this goal, Fair Isaac has included several anticompetitive provisions in its distribution agreements with the three national credit reporting agencies. Foremost, Fair Isaac restricts the credit reporting agencies' ability to develop or distribute competing credit scores. Fair Isaac also uses its royalty prices for FICO Scores to inhibit the credit reporting agencies from bundling a competing score with the FICO Score when selling to downstream customers. In addition, because Fair Isaac has insisted that all three credit reporting agencies pay it the same royalty price for FICO Scores, the individual agencies cannot negotiate for a lower royalty and pass along that benefit to their customers.

58.    At the same time, Fair Isaac has waged a media campaign specifically against VantageScore and made false and misleading statements in order to sow fear, uncertainty, and doubt about VantageScore's reliability. The result has been to restrain competition in the market for credit scores, to increase prices for FICO Scores, and to limit access to credit for millions of Americans.

**A.    Fair Isaac Has Imposed Anticompetitive Contract Terms on the Credit Reporting Agencies that Restrict Their Ability to Compete and Sell Other Credit Scores, Including VantageScore**

59.    With TransUnion's prior contracts with Fair Isaac set to expire on December 31, 2014, Fair Isaac demanded that TransUnion enter into a new Analytic and Data License Agreement ("ADLA") rather than renewing the parties' existing contracts. Fair Isaac represented to TransUnion that TransUnion's two major competitors, Experian and Equifax, had already agreed to materially similar new contracts with Fair Isaac and said that if TransUnion did not agree to the terms demanded by Fair Isaac, it would lose substantial business from customers that depend on FICO Scores. In its counterclaims against Fair Isaac, TransUnion alleged that it would

not have accepted many of the terms in the ADLA if it were not for Fair Isaac's monopoly and market power in the market for credit scores.[22]

60.     TransUnion also revealed in its counterclaims that Fair Isaac provided the initial draft of the ADLA on October 3, 2014, less than three months before the parties' existing contracts were set to expire. TransUnion alleged that "the short time between that date and expiration created immense time pressure" and that "Fair Isaac refused to grant . . . even short-term extensions on the existing agreements until the very end of the process."[23] Nevertheless, with Fair Isaac's assurances that TransUnion's competitors agreed to materially similar contracts, TransUnion signed the agreement.

61.     Ultimately, by signing these contracts, Equifax, Experian, and TransUnion acted in furtherance of Fair Isaac's plan to exclude competitors and maintain its monopoly.

### 1.     Fair Isaac Has Restricted the Credit Reporting Agencies' Ability to Develop or Sell Other Credit Scores Compatible with Customers' Existing Systems

62.     Section 12.5 of the ADLA, which is labeled "No Equivalent Products," provides that TransUnion may not "internally develop" a credit scoring system that is "aligned to the odds-to-score relationship of any Fair Isaac Analytic" or uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic. Section 12.5 of the ADLA further prohibits TransUnion from distributing "any competing analytic" (i.e., credit scoring system) that is aligned with FICO Scores or uses too many of the same reason codes, and it expressly names Vantage Score Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."

---

[22] *Fair Isaac Corporation v. Trans Union, LLC*, No. 17-cv-08318 (N.D. Ill.), ECF No. 38.
[23] *Id.*

63.     For example, if a VantageScore product used a 700 score to indicate a less-than-five-percent risk of credit delinquency, and if a 700 FICO Score also indicated the same risk of delinquency, then Section 12.5 prevents TransUnion from distributing the competing VantageScore product. Similarly, if a VantageScore product used reason codes that match 20% of the reason codes used by FICO scoring systems, Section 12.5 prohibits TransUnion from distributing the product.

64.     Section 12.5 effectively prevents TransUnion from selling an alternative to FICO's credit scores that would be compatible with many businesses' systems, models, and processes and allow lenders to have a legitimate choice between using FICO Scores and an alternative score. Many lenders have spent substantial effort and resources to develop systems, models, and processes that are designed for FICO Scores. Lenders' systems, models, and processes are tailored to FICO's odds-to-score relationship (i.e., each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO Scores and reason codes, combine this information with data it collects internally, and automatically produce a lending decision.

65.     Section 12.5 protects Fair Isaac's monopoly and not its intellectual property. The odds-to-score relationship is an arbitrary mapping between risk and score and does not reflect protectable intellectual property. Similarly, there is nothing proprietary about the reasons that might be used in a credit rating; Fair Isaac certainly did not invent them. Rather, they reflect well-established industry best practices for lending.

66.     Fair Isaac has imposed a similar or identical "No Equivalent Products" term on Equifax and Experian. By imposing a "No Equivalent Products" term on TransUnion, Equifax,

and Experian, Fair Isaac has sought to block all three credit reporting agencies from offering alternative VantageScore products that would allow lenders to easily switch from FICO Scores to VantageScore without incurring the cost of redesigning their lending programs and systems or to use VantageScore alongside or interchangeably with FICO Scores.

> **2.    Fair Isaac Has Engaged in a Pricing Scheme to Unlawfully Leverage Its Monopoly Power and Foreclose Competition from VantageScore in the Credit Score Market**

67.    Section 9.2 of the ADLA, labeled "Dynamic Royalty Schedule," provides that "once every twelve (12) months during the Term, Fair Isaac shall have the right to replace the Royalty Schedule by providing a new royalty schedule to TransUnion in writing." While this provision gives Fair Isaac the right to adjust prices, it does not give Fair Isaac the power to introduce new contract terms, royalty categories, or definitions. Fair Isaac has abused and exploited this provision in 2015, 2016, and 2017 by not only raising prices but also introducing entirely new and non-negotiated contract terms, royalty categories, and definitions.

68.    In 2015, Fair Isaac unilaterally imposed a new "Pre-Qualification" royalty category. In a footnote to the current royalty schedule, Fair Isaac defines "Pre-Qualification" to "mean an End User's qualification of a potential consumer customer for an End User's own internal lending offering" and distinguishes between: (1) lenders that use FICO Scores for "Pre-Qualification" without providing any credit score or credit data to consumers and (2) lenders that use FICO Scores for "Pre-Qualification" and also provide credit scores or credit data to consumers "in connection" with the "Pre-Qualification." Certain large banks and lenders offer consumer customers opportunities to apply to qualify for credit opportunities (e.g., a credit card or loan) and, at the same time, receive their personal credit score. The offer of a free credit score to a consumer can entice consumers to apply for credit opportunities.

69. The royalty price associated with a FICO Score used for "Pre-Qualification" depends on whether other credit scores or credit data are provided to consumers. If a lender purchases a FICO Score for use in "Pre-Qualification" and does not provide any credit score or credit data to the consumer "in connection" with the "Pre-Qualification," there is one per-score royalty rate. If the lender purchases a FICO Score for use in "Pre-Qualification" and provides a VantageScore (or any other credit score) to the consumer "in connection" with the "Pre-Qualification," there is a different per-score royalty rate that is higher—a penalty rate.

70. The penalty rate can be avoided in one of two ways, both of which involve purchasing exclusively FICO Scores. First, the lender could purchase a FICO Score for use in "Pre-Qualification" and provide no credit score or credit data to the consumer. Second, the lender could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of scores by lenders (in the B2B market) with the provision of scores to consumers (in the B2C market).

71. Fair Isaac's contracts with Equifax and Experian include a similar or identical "Dynamic Royalty Schedule" provision and Fair Isaac has imposed a similar or identical "Pre-Qualification" royalty category on Equifax and Experian. Through the "Pre-Qualification" royalty category, Fair Isaac has leveraged its entrenched monopoly power in the larger B2B market to exclude competitors from the emerging B2C market. Fair Isaac's royalties effectively foreclose the credit reporting agencies from selling lenders FICO Scores for use in the B2B market and VantageScores for use in the B2C market and drives lenders to buy exclusively Fair Isaac's FICO Scores. As a consequence of Fair Isaac's imposition of the "Pre-Qualification" royalty category, TransUnion has lost sales of VantageScore to major banks for use in the B2C market.

72.     There is no legitimate business justification for the penalty rate Fair Isaac demands for FICO Scores when the lender also purchases a VantageScore (or any other competing credit score) to disclose to consumers. The transparent goal of the "Pre-Qualification" royalty category is to drive all of a credit bureau's customers engaging in "Pre-Qualification" to purchase exclusively FICO Scores and make it cost-prohibitive for customers engaging in "Pre-Qualification" to purchase any competing credit score for disclosure to consumers.

### 3.     Fair Isaac Has Imposed Contract Provisions that Allow It to Extract Monopoly Prices

73.     Section 9.16 of the ADLA, which is labeled "Level Playing Field," requires that the prices that are made available to TransUnion be made available to the other credit reporting agencies. Taken together, Section 9.2 ("Dynamic Royalty Schedule") and Section 9.16 ("Level Playing Field") enable Fair Isaac to unilaterally increase the royalty prices it charges for FICO Scores. Fair Isaac's contracts with Equifax and Experian include similar or identical "Level Playing Field" and "Dynamic Royalty Schedule" provisions.

74.     Fair Isaac has used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in its contracts with the credit reporting agencies to extract monopoly prices from all three credit reporting agencies and their customers and prevent any credit reporting agency from negotiating lower royalty prices than the others. For example, in 2017, less than a month after the Director of the Federal Housing Finance Agency ("FHFA") announced that Fannie Mae and Freddie Mac would continue requiring the use of Fair Isaac's FICO Classic products in connection with their mortgage programs through at least 2019, Fair Isaac increased the price of FICO Scores used for "Mortgage" by a certain amount, dependent on the quantity of scores purchased. On information and belief, Fair Isaac imposed the same pricing increase on all of the credit agencies. Fair Isaac's pricing increase has the effect of raising costs not only for the credit

reporting agencies but also for banks, mortgage lenders, and—ultimately—ordinary consumers seeking mortgage loans.

### B. Fair Isaac's Campaign to Create Fear, Uncertainty, and Doubt About VantageScore with Lenders and Consumers

75.     Fair Isaac has waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead lenders and consumers about the qualities and characteristics of FICO Scores and VantageScore. In advertisements, letters, and blog posts, Fair Isaac has disparaged VantageScore by calling it a "Fako" score, falsely claimed that VantageScore is an unreliable measure of creditworthiness, and misrepresented the information considered by VantageScore's credit scoring system.

76.     On December 12, 2017, Fair Isaac took out a full-page advertisement in the *Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates" that disparaged VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO Scores have been used "by lenders and securitization investors for decades," with an alternative credit score, which is "owned by the credit bureaus," is less reliable than FICO Scores in evaluating credit risk, and fails to use "sound practices" or "science-based credit evaluation." To anyone familiar with the market for credit scores, the advertisement unambiguously conveys the false message that VantageScore is "Weakening scoring standards, [and] harm[ing] consumers, and the lending system."

77.     The *Wall Street Journal* advertisement directed readers to "[l]earn more at FICO.com/independent," a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name. One such blog post asserts: "Despite claims by

VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."[24]

78.     Also during December 2017, Mr. Lansing was quoted in the *Financial Times* disparaging VantageScore as a "Fako" score.[25] Mr. Lansing accused JPMorgan Chase and Capital One of confusing consumers about their creditworthiness by distributing VantageScore because VantageScore is not used by the banks for lending decisions.

79.     Fair Isaac's public website includes numerous posts disparaging VantageScore and making false or misleading statements about VantageScore's features. For example, one blog post claims that "[r]esearch results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance."[26] This statement is false and misleading because it conveys the false message that VantageScore's scoring model is "weak" and does a "poor job forecasting future performance" because it considers a consumer's full credit history even if the consumer has not used a traditional credit line in the last six months. In fact, studies have shown that VantageScore is strongly predictive.

80.     Another blog post claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not."[27] This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact, VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0,

---

[24] "Truth Squad: Will Looser Scoring Standards Help Millions More Americans Get Mortgages?" FICO, *available at* https://www.fico.com/blogs/truth-squad-will-looser-scoring-standards-help-millions-more-americans-get-mortgages.

[25] "Credit score row as FICO chief hits out at banks over 'Fako' rivals," Financial Times, *available at* https://www.ft.com/content/2222880c-cfa5-11e7-9dbb-291a884dd8c6.

[26] "Why Bureau Data Alone Can't Score More Consumers," FICO, *available at* https://www.fico.com/blogs/why-bureau-data-alone-can-t-score-more-consumers.

[27] "Truth Squad: Is FICO Score 700 the Same as VantageScore 700?" FICO, *available at* https://www.fico.com/blogs/truth-squad-fico-score-700-same-vantagescore-700.

the most recent version of VantageScore, which was announced in April 2017, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones.

81.     Fair Isaac has also argued that the VantageScore products that TransUnion distributes are flawed because they have different odds-to-score relationships and different reason codes than FICO products. In a "Truth Squad" blog post on its public website, Fair Isaac argues that a "clean swap-out" of FICO Scores for VantageScores will not work for lenders because the "FICO Score and VantageScore . . . do not share the same odds-to-score relationship, meaning the risk at a given score is different."[28] Fair Isaac also claims that comparing VantageScores to FICO Scores is "confusing" and that a lender that attempts to use both types of scores may make "poor lending and investment decisions" because of the "important differences" in the odds-to-score relationship.[29]

82.     Fair Isaac's campaign against VantageScore is not new. In October 2006, just months after the launch of VantageScore, Fair Isaac filed a lawsuit against TransUnion, Equifax, Experian, and VantageScore in the United States District Court for the District of Minnesota[30]. Fair Isaac's numerous claims included a claim that the development of VantageScore violated the antitrust laws and a claim that the development of VantageScore constituted trademark infringement. In its prayer for relief, Fair Isaac sought nothing less than the end of VantageScore, requesting that the "Defendants be ordered to dissolve VantageScore."[31]

---

[28] *Id.*

[29] *Id.*

[30] *Fair Isaac Corporation v. Equifax Inc. et al.*, 06-CV-04112 (D. Minn.), ECF 1.

[31] *Id.*

83. All of Fair Isaac's claims failed, and, in fact, the jury concluded that Fair Isaac was the wrongdoer. In support of its trademark infringement claim, Fair Isaac had alleged that VantageScore's use of a scoring range of 501-990 constituted trademark infringement because it was similar to FICO's scoring range of 300-850. The credit reporting agencies and VantageScore counterclaimed for fraud on the United States Patent and Trademark Office ("PTO"), alleging that Fair Isaac had misrepresented to the PTO that only FICO used the 300-850 score range. The jury concluded that Fair Isaac had committed fraud on the PTO by making false statements as part of its application to register the score range of 300-850 as a trademark.

84. The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers in the United States.

### C.    Fair Isaac's Anticompetitive Conduct Harms Competition and Consumers

85. Fair Isaac's campaign of exclusionary conduct to maintain and expand its monopoly has harmed and continues to harm participants in both the B2B and B2C markets of the credit risk scoring market by foreclosing opportunities for the credit reporting agencies to sell VantageScore. If allowed to continue, Fair Isaac's conduct will ultimately force VantageScore, its primary competitor, out of the market entirely, and deprive the credit reporting agencies of the ability to sell VantageScores to customers. In turn, Fair Isaac has been able to impose monopoly prices and more onerous terms on the credit reporting agencies, resulting in higher costs for the businesses and consumers that use credit scores.

86. Fair Isaac's conduct has reduced choice for the credit reporting agencies, lenders, and consumers. The anticompetitive terms that Fair Isaac has imposed on the credit reporting agencies have frustrated their ability to sell VantageScore at competitive prices or sell competing credit scores (from VantageScore or any other competitor) that could be seamlessly integrated into lenders' existing processes and systems. And, Fair Isaac's media and advertising campaign

against VantageScore has been successful in sowing fear, uncertainty, and doubt about VantageScore in the marketplace. Media sources, financial blogs, and consumers have absorbed Fair Isaac's message that VantageScore is a "Fako" score merely because it is not a FICO Score. For example, thebalance.com—a website devoted to personal finance issues—posted in February 2017: "If you purchased your credit score anywhere but MyFICO.com, then it's a Fako score."[32]

## VII.    PLAINTIFF'S CLAIMS ARE TIMELY

### A.      Fair Isaac Concealed Its Unlawful Scheme

87.     During the Class Period, Fair Isaac wrongfully and affirmatively concealed its unlawful conduct. Plaintiff and members of the Class had no knowledge of Fair Isaac's unlawful scheme and could not have discovered the scheme through the exercise of reasonable diligence until February 12, 2018 when TransUnion filed its counterclaims against Fair Isaac.[33]

88.      Fair Isaac wrongfully and affirmatively concealed the existence of its anticompetitive scheme from Plaintiff and the public by, among other things, concealing the restrictive nature of the contracts between Fair Isaac and the three national credit reporting agencies—contracts which have prevented the credit reporting agencies from developing or selling alternative credit scores and have imposed a pricing scheme that forecloses lenders from using VantageScore in their B2C businesses. Additionally, contracts between Fair Isaac and the credit reporting agencies, such as the ADLA, are subject to confidentiality provisions that have prohibited the credit reporting agencies from disclosing terms of those contract to third parties absent written authorization from Fair Isaac.

---

[32] "FICO & FAKO Credit Scores," the balance, *available at* https://www.thebalance.com/fico-and-fako-credit-scores-960497.

[33] *Fair Isaac Corp. v. Trans Union, LLC*, No. 17-cv-08318 (N.D. Ill.), ECF No. 38.

89.     As a result of Fair Isaac's fraudulent concealment, all applicable statutes of limitations affecting Plaintiff's claims have been tolled.

###    B.    Fair Isaac's Actions Are a Continuing Violation

90.     In addition, this Complaint alleges a continuing course of conduct (including conduct within the limitations periods). Therefore, should the Court not find that any applicable statute of limitations was not tolled due to Defendant's fraudulent concealment, Plaintiff and members of the Class are entitled to recover damages they suffered during the limitations period.

91.     A claim accrued for Plaintiff each time Fair Isaac offered FICO Scores to Plaintiff at prices artificially inflated by Fair Isaac's anticompetitive conduct. Each offer of FICO Scores at a supra-competitive price constituted another overt act in furtherance of Fair Isaac's continuing anticompetitive scheme.

## VIII.   CLASS ACTION ALLEGATIONS

92.     Plaintiff brings this action on behalf of itself and, under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), as representatives of a Class defined as follows:

> All B2B Purchasers residing in the United States that directly purchased a FICO Score from Fair Isaac and/or a Credit Bureau beginning at least as early as January 1, 2006 until the effects of Fair Isaac's conduct cease ("Class Period").

93.     The following persons and entities are excluded from the Class:

(a)     Fair Isaac and its counsel, officers, directors, management, employees, subsidiaries, or affiliates;

(b)     All natural persons that purchased their own Credit Score solely via myFico.com, the Credit Bureaus, or other entities for their personal use;

(c)     All governmental entities;

(d)     All Counsel of Record; and

(e)     The Court, Court personnel, and any member of their immediate families.

94. Members of the Class are so numerous and so widely dispersed throughout the country that joinder is impracticable. Further, the Class is readily identifiable from information and records in Defendants' possession.

95. Plaintiff's claims are typical of the claims of all members of the Class. Plaintiff's claims arise out of the same common course of conduct that gives rise to the claims of the other members of the Class. Plaintiff and all members of the Class were and will continue to be damaged by the same wrongful conduct.

96. Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

97. Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise in class action antitrust litigation in the financial industry.

98. Questions of law and fact common to the Class include:

(a) Whether Fair Isaac unlawfully maintained monopoly power through all or part of their overall anticompetitive scheme;

(b) Whether there exist any legitimate procompetitive reasons for some or all of Fair Isaac's conduct;

(c) To the extent any such procompetitive benefits exist, whether there were less restrictive means of achieving them;

(d) Whether Fair Isaac's scheme, in whole or in part, has substantially affected interstate commerce;

(e) Whether Fair Isaac's anticompetitive conduct caused antitrust injury through overcharges to the business or property of Plaintiff and members of the Class; and

(f)     The quantum of aggregate overcharge damages to the Plaintiff and members of the Class.

99.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual class members, because Fair Isaac has acted on grounds generally applicable to the entire Class.

100.    Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

101.    Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### Sherman Act § 2: Unlawful Monopolization

102.    Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

103.    The market for the sale of B2B credit scores constitutes a relevant product market in the United States.

104.    Fair Isaac has, and at all relevant times had, monopoly power in the market for B2B credit scores.

105.    Through unlawful, interconnected, and mutually reinforcing anticompetitive acts, Fair Isaac has substantially foreclosed competition in the market for B2B credit scores in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

106.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices without a corresponding decrease in demand, and to supracompetitive levels.

107.    Fair Isaac could not have maintained its monopoly power in the market for B2B credit scores if it were not for the anticompetitive contract terms it has imposed on the credit reporting agencies and its campaign of false and misleading statements about VantageScore.

108.    Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

109.    Fair Isaac's monopolization has injured and will continue to injure competition in the relevant market.

110.    Fair Isaac's exclusionary and anticompetitive acts affect interstate commerce and injure competition nationwide.

111.    There is no legitimate business or pro-competitive justification for Fair Isaac's conduct, and any purported legitimate business justification is a mere pretext. Indeed, even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

112.    As a direct, substantial, and proximate result of Fair Isaac's anticompetitive and unlawful actions, Plaintiff and members of the Class have been injured in their business or property in an amount to be established at trial. Plaintiff and members of the Class are each entitled to treble damages for Fair Isaac's violations of the Sherman Act alleged herein.

113.    Plaintiff and members of the Class are threatened with future injury to their business and property unless the injunctive relief requested is granted.

## COUNT II
### Sherman Act § 2: Conspiracy to Monopolize

114.    Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

115.    The market for the sale of B2B credit scores constitutes a relevant product market in the United States.

116.    Fair Isaac has, and at all relevant times had, monopoly power in the market for B2B credit scores.

117.    Through unlawful, interconnected, and mutually reinforcing anticompetitive acts, Fair Isaac has substantially foreclosed competition in the market for B2B credit scores in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

118.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices to supracompetitive levels without a corresponding increase in demand.

119.     Fair Isaac entered into a combination or conspiracy with TransUnion, Experian, and Equifax to maintain its monopoly power in the market for B2B credit scores. Fair Isaac created and maintained this combination or conspiracy through a series of agreements with each of the three credit bureaus. In these agreements, the credit bureaus and Fair Isaac agreed that the credit bureaus would not offer or sell VantageScore or any other competing credit score to Plaintiff and members of the Class.

120.    These agreements foreclosed competition in a substantial portion of the B2B Credit Score Market and unlawfully maintained Fair Isaac's monopoly, resulting in Fair Isaac extracting supracompetitive prices for FICO Scores from Plaintiff and members of the Class.

121.    Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

122.    Fair Isaac's monopolization conspiracy has injured and will continue to injure competition in this market.

123.    Fair Isaac has acted with the specific intent of monopolizing the market for B2B credit scores in the United States.

124.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

125.    There is no legitimate business or pro-competitive justification for Fair Isaac's conduct, and any purported legitimate business justification is a mere pretext. Indeed, even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

126.    As a direct, substantial, and proximate result of Fair Isaac's anticompetitive and unlawful actions, Plaintiff and members of the Class have been injured in their business or property in an amount to be established at trial. Plaintiff and members of the Class are each entitled to treble damages for Fair Isaac's violations of the Sherman Act alleged herein.

127.    Plaintiff and members of the Class are threatened with future injury to their business and property unless the injunctive relief requested is granted.

## COUNT  III
### Sherman Act § 1: Contract in Restraint of Trade

128.    Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

129.    The market for the sale of B2B credit scores constitutes a relevant product market in the United States.

130.    Fair Isaac has, and at all relevant times had, monopoly power in the market for B2B credit scores.

131.    Fair Isaac and TransUnion, Experian, and Equifax entered into agreements that contained anticompetitive terms whereby each credit bureau agreed not to offer or sell VantageScore credit scores as a competing product to Plaintiff and members of the Class.

132.    The agreements between Fair Isaac and the credit bureaus had substantial anticompetitive effects. The agreements excluded VantageScore, a significant competitor, from a substantial portion of competition in the B2B Credit Score Market and raised the prices for FICO Scores above the competitive level.

133.    Fair Isaac's exclusionary and anticompetitive acts substantially affect interstate commerce and injure competition nationwide.

134.    There is no legitimate business or pro-competitive justification for Fair Isaac's conduct, and any purported legitimate business justification is a mere pretext. Indeed, even if such a justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

135.    As a direct, substantial, and proximate result of Fair Isaac's anticompetitive and unlawful actions, Plaintiff and members of the Class have been injured in their business or property in an amount to be established at trial. Plaintiff and members of the Class are each entitled to treble damages for Fair Isaac's violations of the Sherman Act alleged herein.

136.    Plaintiff and members of the Class are threatened with future injury to their business and property unless the injunctive relief requested is granted.

## COUNT IV
## State Antitrust Laws

137.    Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

138.    Defendant has violated, and Plaintiff and members of the Class are entitled to relief under, the antitrust laws of the States of Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, as well as the District of Columbia, as follows:

> (a)    Ariz. Rev. Stat. Ann. §§ 44-1403, *et seq.*;
>
> (b)    Cal. Bus. Code §§ 16700, *et seq.*;
>
> (c)    Conn. Gen. Stat. §§ 35-27, *et seq.*;
>
> (d)    D.C. Code §§ 28-4503, *et seq.*;
>
> (e)    Haw. Rev. Stat. §§ 480-2, 480-9, *et seq.*;
>
> (f)    740 Ill. Comp. Stat. §§ 10/3, *et seq.*;
>
> (g)    Iowa Code §§ 553.5, *et seq.*;
>
> (h)    Kan. Stat. Ann. §§ 50-112, *et seq.*;
>
> (i)    Me. Rev. Stat. Ann. 10 §§ 1102, *et seq.*;
>
> (j)    MD Code Ann., Com. Law, §§ 11-204, *et seq.*;
>
> (k)    Mich. Comp. Laws Ann. §§ 445.773, *et seq.*;
>
> (l)    Minn. Stat. §§ 325D.52, *et seq.* and Minn. Stat. §§ 8.31, *et seq.*;
>
> (m)    Miss. Code Ann. §§ 75-21-3, *et seq.*;
>
> (n)    Neb. Rev. Stat. §§ 59-802, *et seq.*;

(o)     Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*;

(p)     N.H. Rev. Stat. Ann. §§ 356:3, *et seq.*;

(q)     N.M. Stat. Ann. §§ 57-1-2, *et seq.*;

(r)     N.Y. Gen. Bus. Law § 340;

(s)     N.C. Gen. Stat. §§ 75-2.1, *et seq.*;

(t)     N.D. Cent. Code Ann. §§ 51-08.1-03, *et seq.*;

(u)     Or. Rev. Stat. §§ 646.730, *et seq.*;

(v)     R.I. Gen. Laws §§ 6-36-5, *et seq.*;

(w)     S.D. Codified Laws §§ 37-1-3.2, *et seq.*;

(x)     Tenn. Code Ann. §§ 47-25-101, *et seq.*;

(y)     Utah Code Ann. §§ 76-10-3104, *et seq.*;

(z)     Vt. Stat. Ann. 9, §§ 2453, *et seq.*;

(aa)    W.Va. Code §§ 47-18-4, *et seq.*;

(bb)    Wis. Stat. §§ 133.03, *et seq.*

## COUNT V
### State Unfair and Trade Practices Laws

139.    Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

140.    By reason of the foregoing, Defendant has violated, and Plaintiff and members of the Class are entitled to relief under, the Unfair Trade Practices and Consumer Protection Laws of the States of Arkansas, California, Connecticut, Florida, Massachusetts, Missouri, Montana, New Mexico, New York, North Carolina, Rhode Island, South Carolina, and Vermont, as well as the District of Columbia, as follows:

(a)     Ark. Code Ann.§§ 4-88-101, *et seq.*;

(b)     Cal. Bus. & Prof Code §§ 17200, *et seq.*;

(c)     Conn. Gen. Stat. §42-110a, *et seq.*;

(d)     D.C. Code §§ 28-3901, *et seq.*;

(e)     Fla. Stat. §§ 501.201, *et seq.*;

(f)     Mass. Gen. Laws ch. 93A, *et seq.*;

(g)     Mo. Rev. Stat. §§ 407.010, *et seq.*;

(h)     Mont. Code Ann., §30-14-103, et seq., and §30-14-201, *et seq.*;

(i)     N.M. Stat. Ann. §§ 57-12-1, *et seq.*;

(j)     N.Y. Gen. Bus. Law §§ 349, *et seq.*;

(k)     N.C. Gen. Stat. §§ 75-1, *et seq.*;

(l)     R.I. Gen. Laws §§ 6-13.1-1, *et seq.*;

(m)     S.C. Code Ann. §39-5-10, *et seq.*; and

(n)     VT. Stat. Ann., tit. 9, §2451, *et seq.*

## IX.     DEMAND FOR RELIEF

141.     Accordingly, Plaintiff, on behalf of itself and the proposed Class, respectfully demands that the Court:

(a)     Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiff as named representative of the Class;

(b)     Enter judgment against Fair Isaac and in favor of Plaintiff and the Class;

(c)     Award damages (*i.e.*, three times overcharges) to the Class in an amount to be determined at trial, plus interest in accordance with law;

(d)     Enter injunctive relief to stop Fair Isaac's unlawful conduct;

(e)     Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

(f)     Award such further and additional relief as is necessary to correct for the anticompetitive market effects Fair Isaac's unlawful conduct caused and as the Court may deem just and proper under the circumstances.

## X.     JURY DEMAND

142.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.

Date: June 9, 2020                    Respectfully submitted,


                                      By:      */s/ Marvin A. Miller*

                                      Marvin A. Miller
                                      Lori A. Fanning
                                      **MILLER LAW LLC**
                                      115 South LaSalle Street, Suite 2910
                                      Chicago, Illinois 60603
                                      Telephone: (312) 332-3400
                                      mmiller@millerlawllc.com
                                      lfanning@millerlawllc.com

                                      *Local Counsel for Plaintiff and the Proposed Class*

                                      Gregory S. Asciolla (*pro hac vice* forthcoming)
                                      Karin E. Garvey (*pro hac vice* forthcoming)
                                      Robin A. van der Meulen (*pro hac vice* forthcoming)
                                      Matthew J. Perez (*pro hac vice* forthcoming)
                                      Jonathan S. Crevier (*pro hac vice* forthcoming)
                                      **LABATON SUCHAROW LLP**
                                      140 Broadway
                                      New York, New York 10005
                                      Telephone: (212) 907-0700
                                      gasciolla@labaton.com
                                      kgarvey@labaton.com
                                      rvandermeulen@labaton.com
                                      mperez@labaton.com
                                      jcrevier@labaton.com

                                      Charles F. Barrett (*pro hac vice forthcoming*)
                                      **NEAL & HARWELL, PLC**
                                      1201 Demonbreun Street
                                      Suite 1000
                                      Nashville, Tennessee 37203
                                      Telephone: (615) 244-1713
                                      cbarrett@nealharwell.com

                                      Don Barrett (*pro hac vice forthcoming*)
                                      **BARRETT LAW GROUP, P.A.**
                                      404 Court Square
                                      P.O. Box 927
                                      Lexington, Mississippi 39095
                                      Telephone: (662) 834-2488
                                      dbarrett@barrettlawgroup.com

donbarrettpa@gmail.com

Richard R. Barrett (*pro hac vice forthcoming*)
**BARRETT LAW GROUP, P.A.**
2086 Old Taylor Road, Suite 1011
Oxford, Mississippi 38655
Telephone: (662) 380-5018
rrb@rrblawfirm.net

*Attorneys for Plaintiff and the Proposed Class*